VENERABLE PROPERTIES, INC.,
*Plaintiff,*

*v.*

CLATSOP COUNTY ASSESSOR,
*Defendant.*

(TC-MD 010675D)

A telephone trial was held August 7, 2002.

Art DaMuro, President and Licensed Real Estate Broker, Venerable Properties, Inc., argued the cause for Plaintiff.

John A. Solheim, Commercial Appraiser, argued the cause for Defendant.

Decision for Defendant rendered October 29, 2002.

**Jill A. Tanner, Presiding Magistrate.**

Plaintiff appeals the real market value of its property for tax year 2000-2001. A telephone trial was held on Wednesday, August 7, 2002. Art DaMuro (DaMuro), President, Venerable Properties, Inc., and a licensed real estate broker, testified on behalf of Plaintiff. John A. Solheim (Solheim), Commercial Appraiser, testified on behalf of Defendant. Steven Robinson, for Plaintiff, and L. Catherine Harper, Clatsop County Senior Appraiser, for Defendant, were present.

## I. STATEMENT OF FACTS

After negotiating with the City of Astoria and signing a development agreement, Plaintiff purchased a 15.67 acre parcel in early 1999 for a total purchase price of $700,000. Simultaneously, Plaintiff sold 1.77 acres of the parcel to Wauna Credit Union for $538,370. The balance of the parcel[1] described as Clatsop County Assessor's Account 50272 is the subject of this appeal. DaMuro emphasized to the court that the City of Astoria's newspaper reported in 1997 that it was negotiating with an interested party to purchase the property for $1.12 million. That offer did not result in a sale. Finally, in April 1999, Plaintiff offered $700,000, which the city accepted. DaMuro testified that this was an arm's-length transaction with the City of Astoria, culminating in a final agreement imposing substantial restrictions on the purchaser/developer.

Plaintiff alleges that the real market value of the subject property, Mill Pond Village, is no more than $255,000[2] for tax year 2001-02. In support, Plaintiff submitted a Development Cost Analysis prepared by Erick P.

---

[1] Even though mathematically the number of acres after the sale is 13.90 acres, the parties agree that the size of the subject property is 13.15 acres.

[2] Plaintiff orally amended its Complaint, asking the court to reduce the real market value to $255,000. The court's recent holding in *Chart Development Corp. v.*

Landeen (Landeen), MAI, Integra Realty Resources. After noting that his analysis is not an appraisal, Landeen explained that he used the "development approach" to determine his estimate of real market value because the "subject is unique." According to Landeen, the development approach "combines all the approaches to value (sales comparison approach to arrive at lot sales, costs relate to the cost approach, and development of net income and discounting are similar to the income approach)" and is the "approach most potential buyers would consider." (Emphasis in original.) Using actual sales of lots in the Mill Pond Village, Landeen projected sales by year, then reduced the gross sales by costs or expenses including a 20 percent entrepreneurial profit to determine a net operating income. The net operating income was discounted at 10 percent to reflect "the cost of capital, as most of the risk is accounted for in the entrepreneurial profit."

DaMuro testified that because this property is the "gateway" entrance to the City of Astoria, the development restrictions imposed by the city are unusual. Architectural Guidelines setting minimum standards for design, including use, height placement, vehicle storage, and allowable building materials and configurations were published. In addition, because contamination was found on the property and the property was termed an "Orphan Site," Plaintiff agreed to abide by the terms of an agreement between the City of Astoria and the Oregon Department of Environmental Quality (DEQ). Among the measures to be undertaken by Plaintiff, DEQ requires that the ground water be tested yearly for the next 10 years. To date, in meeting those restrictions and preparing the property for development, DaMuro testified that costs were incurred to reconstruct the south pond bank and tidal gate, to conduct required monitoring and testing of the soil, to improve 29th Street, and to demolish structures left by the prior users of the property.

In reviewing the restrictions imposed by the city, DaMuro testified that as the developer, within 24 months of

---

*Dept. of Rev.*, 16 OTR 9, 14 (2001) states that the value allegations found in a pleading are critical because they set the boundaries for the relief the Tax Court may grant.

the date of purchase, he was required to file a final plat plan for the first two phases of the development, install public improvements in the first phase and either install the public improvements in the second phase or post a bond guaranteeing the completion. If DaMuro failed to meet these obligations, the city had the right to repurchase the property for $350,000, excluding the property sold to Wauna Federal Credit Union and other bona fide purchasers. The "24-month" time period to complete the items set forth above was extended by agreement to December 31, 2002. DaMuro testified that the 24-month time period has been extended a third time to June 2003. The extensions of time were required because, since the date of the purchase, Plaintiff has sold only eight out of a potential 85 lots (all in Phase I), sold one model home on the market for 18 months and continues to have in inventory another model home for sale.

Solheim testified that Plaintiff's property is "unique historically" because it was the site of Astoria Plywood Corporation, producing sanded plywood until the late 1980s. He further testified that Plaintiff's acquisition of the property brings a "positive change" to the city because the property sat idle with abandoned buildings for many years.

In reviewing Plaintiff's purchase price of $700,000 for the property, Solheim stated that based on discussions with the Community Development Director for the City of Astoria, the price was not based on real market value at the time of sale. Instead, the sale price was set by the city to cover its "obligation to DEQ for clean-up costs." Solheim testified that the city did not commission an appraisal report.

In September 1996, Landeen prepared "A Limited Summary Appraisal Report" of the Astoria Plywood Mill Site. At that time, Landeen stated that the purpose of his appraisal was to "estimate the market value of the unencumbered fee simple interest in the real estate, following clean up of hazardous waste contamination." He concluded that the real market value of the "mill site" was $1,120,000. In determining the value, Landeen assumed that the city would permit a zoning change to allow a high-density, mixed-use residential development. In fact, the city did allow the zoning change. Solheim testified that if he was relying on Landeen's

appraisal, he would be asking the court for a value higher than is currently on the roll. DaMuro reminded the court that Landeen's report is six years old and was a "theoretical estimate of value" without knowing the DEQ requirements and city restrictions imposed on the property at the actual time of sale. DaMuro testified that since the date of Landeen's appraisal there has been an arm's-length sales transaction, showing that Landeen's value was too high. In criticizing Landeen's development cost approach used in preparing Plaintiff's Exhibit 1, Solheim reminded the court that the Oregon Revised Statutes (ORS) and case law, citing *First Interstate Bank v. Dept. of Rev.* and *Mathias v. Dept. of Rev.*,[3] require the county assessor to value the property at real market value. He described Landeen's approach as Plaintiff "looking at owner's interest less related costs."

At the assessment date, January 1, 2000, Solheim characterized the value of Plaintiff's property as an undeveloped tract in a "raw state." The county did not increase the roll value when the city changed the zoning. He concluded that the value of the property in its developed state would be substantially higher.

Solheim submitted a sale of industrial property of comparable size to Plaintiff's property, which occurred nine months after the assessment date of Plaintiff's property. Like Plaintiff's property, the industrial property was on the market for a substantial period of time. The buyer of the industrial property sought and received a zoning change. Like Plaintiff's property, the industrial property has no direct access to the river. The industrial property sold on September 25, 2000, for $1.35 per square foot. Solheim stated that this compares favorably with Plaintiff's property, which is on the tax roll at $1.10 per square foot. The board of property tax appeals sustained the real market value of $632,560 and assessed value of $467,432 for Plaintiff's property in its Order, dated March 28, 2001.

---

[3] Defendant did not clarify which court's decision (Oregon Tax Court or Oregon Supreme Court) he was citing to in these two cases.

## II. ANALYSIS

Plaintiff appeals the 2000-2001 real market value of its property. "Real market value is the standard used throughout the ad valorem statutes (except for special assessments)." *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995). Real market value is defined in ORS 308.205(1),[4] which reads:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's length transaction occurring as of the assessment date for the tax year."

Plaintiff alleges that its purchase in April 1999 was an arm's-length transaction that quantifies the real market value of the property. Defendant challenges the sale as arm's length because the City of Astoria's share of the DEQ clean-up costs was $700,000, and, based on Defendant's conversations with city employees, the city was only interested in getting enough money to cover its share of those costs. Defendant also alleges that the city never obtained an appraisal, which supports its conclusion that the sale price was based solely on recovering its clean-up costs.

■ ■ This court has previously held that "the sale of the subject property deserves considerable weight." *Lincoln County Assessor v. YCP Salishan LP*, 15 OTR 354, 359 (2001). As the Oregon Supreme Court in *Kem v. Dept. of Rev.*, 267 Or 111, 114, 514 P2d 1335 (1973) states:

> "If the sale is a recent, voluntary, arm's length transaction between a buyer and seller, both of whom are knowledgeable and willing, then the sales price, while certainly not conclusive, is very persuasive of the market value."

In this case, the evidence supports Plaintiff's position that the sale was an arm's-length transaction between two knowledgeable parties. However, the sale price alone does not reflect the full market value of the property because the size

---

[4] All references to the Oregon Revised Statutes (ORS) are to 1999.

of the subject property is not the same as originally purchased by Plaintiff. In addition, the City of Astoria imposed various restrictions, ordered a change in zoning, and transferred its DEQ obligations to Plaintiff at the time of purchase. The sale price must be adjusted for the subsequent sale and the nonmonetary consideration.

With the subject property sitting idle and available for sale for several years, the City of Astoria was unable to find anyone willing to buy the property. In placing a priority on this property as a gateway to the city, the city's focus shifted to finding someone to develop the property within specific guidelines. When Plaintiff offered to purchase the property, the city responded positively but offered to conclude the agreement with restrictions. In addition to negotiating a sale price of $700,000, the city transferred its DEQ obligations to Plaintiff and required Plaintiff to construct a street (29th Street). At its own expense, Plaintiff had to demolish structures on the property in preparation for selling the lots. These costs, such as the DEQ requirements, street construction, and demolition, were significant obligations that would have been incurred by the city. To satisfy these obligations, Plaintiff incurred costs of approximately $343,800. In transferring these obligations, which are collectively referred to by the court as nonmonetary contribution, to the purchaser (Plaintiff), the city's "cash" sale price does not fully reflect the market value of the property because the nonmonetary contribution increases the purchaser's cost to own this property.

To aid the purchaser/developer, the City of Astoria adopted a new zoning ordinance, permitting a cluster development of a minimum of 18 units per net acre. Although this change in zoning was critical to Plaintiff's ability to develop the property, its value was not quantified by Plaintiff, making it another nonmonetary contribution to the overall market value of the subject property.

The sale price, plus the value of the following nonmonetary contributions: (1) the city's obligations transferred; (2) infrastructure requirements; (3) demolition; and (4) change in zoning must be combined to determine a real market value of the property. With the reported costs ($343,800) incurred by Plaintiff for DEQ, infrastructure

improvements and demolition, but no information as to the impact of the new zoning ordinance on the market value of the property, the court concludes that an indicated market value at the date of sale was more than the cash sale price of $700,000.

Simultaneous to Plaintiff's purchase, a portion of the property was sold. Because there was no evidence suggesting that Plaintiff's sale of a portion of the property was for an amount other than market value, that transaction like Plaintiff's purchase, was arm's length. In determining the value of the subject property, the subsequent sale must be taken into account.

■        In sum, the real market value of Plaintiff's property is measured by the cash purchase price, DEQ obligations transferred, infrastructure and demolition costs, change in zoning, and the subsequent sale of a portion of the subject property. Although the sale price is known, the value of the nonmonetary contribution is not, making the total market value of the subject property at the date of purchase unknown.

■        Even if the real market value of the subject property at the date of purchase was known, the statutory requirement is not met. It is the real market value of the subject property at the date of assessment, January 1, 2000, that is at issue. Further, although the parties agree that the highest and best use of the subject property is a high-density, mixed-use residential development, Plaintiff's focus on the market transaction is too general. Defendant correctly concludes that if the developed state of the subject property was considered, the real market value would be much higher than the "raw land" value it placed on the tax roll.

■        Plaintiff, using the development approach, concludes that the real market value of Plaintiff's property was $255,000. Plaintiff states that its approach is "the approach most potential buyers would consider." (Emphasis in original.) This court has previously held that an approach (the developer's discount) similar to the development approach is not an acceptable method. *See First Interstate Bank v. Dept. of Rev.*, 306 Or 450, 455, 760 P2d 880 (1988). The development approach, defined as reducing the market price of the

individual lots by a rate of return based on expected profit, after considering the time required to sell the lots, values the owner's interest in the property or the value of lots as an investment. The value determined by this approach does not determine a market value, "which is the price that each property would receive on the open market." *Id.* at 454. ORS 308.205 clearly states that all property must be valued at real market value in an arm's-length transaction. Further, real market value "in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue" (DOR). ORS 308.205(2). For the valuation of real property, DOR states that three approaches; sales comparison, cost, and income, shall be considered. OAR 150-308.205-(A)(1)(2)(a). The rule does not include the development approach, which Plaintiff defines in its list of approaches as a blend of all three methods. The court concludes that the development approach is not a permissible method of valuation in this case.

Plaintiff bears the initial burden of proof and must establish an error in real market value by a preponderance of the evidence. ORS 305.427. "Preponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Rev.*, 4 OTR 302, 312 (1971). Plaintiff has failed to meet its burden. After concluding that Plaintiff's development approach is not a permissible valuation method and the sale price paid by Plaintiff in the arm's-length transaction failed to include the value of the nonmonetary consideration, the court finds that the persuasiveness of Plaintiff's evidence is substantially compromised.

Defendant offered a comparable sale as evidence that the real market value of Plaintiff's property should be approximately $1.35 per square foot.[5] Solheim testified that the comparable property located at the east end of the City of Astoria was zoned industrial, listed on the market for many months and similar in size to Plaintiff's property. In addition, Solheim stated that the buyer, like Plaintiff, requested and

---

[5] Defendant concludes that the "Real Market Value [of the subject property] for the 2000/2001 Tax Year, the Tax Year under appeal, was $632,560 or the equivalent of $1.10 per square foot."

was granted a change in zoning. In evaluating the comparability of that property to Plaintiff's, there was no mention of any contamination on or cleanup of the property. In addition, the court notes that the property was not bare land, but had an 800 square foot office building and fenced parking lot. Those two improvements "were leased out and together brought in approximately $2,500 in monthly revenue." Defendant did not adjust the sale price for those improvements or discuss how much the buyer's willingness to purchase the property was influenced by the monthly stream of revenue. The comparability between the properties is reduced when significant items such as monthly revenue and contamination are not addressed.

After carefully considering all the testimony and evidence, the court concludes that Plaintiff has failed to carry the burden of proof. Therefore, the court concludes that the real market value of Plaintiff's property as recorded on the tax roll for tax year 2000-2001 is correct.

### III.   CONCLUSION

Now, therefore,

IT IS THE DECISION OF THIS COURT that the real market value of Plaintiff's property described as Clatsop County Assessor's Account 50272 for tax year 2000-2001 was $632,560.