LINCOLN COUNTY ASSESSOR,
*Plaintiff,*

*v.*

YCP SALISHAN LP,
dba The Westin Salishan,
*Defendant.*

(TC 4509)

Trial was held May 10-11, 2001, in the courtroom of the Oregon Tax Court, Salem.

Rob Bovett, Lincoln County Assistant County Counsel, Newport, argued the cause for Plaintiffs (the county).

Norman J. Bruns, Garvey, Schubert & Barer, Portland, argued the cause for Defendant (taxpayer).

Decision rendered August 3, 2001.

## CARL N. BYERS, Senior Judge.

The subject of these property tax appeals is the well-known Salishan Lodge in Lincoln County. The magistrate found that the real market value (RMV) for tax years 1998-99 and 1999-2000 was substantially less than the maximum assessed value (MAV) and ordered the assessed value reduced.[1] Plaintiff Lincoln County Assessor (the county) appealed and a trial *de novo* on the merits was held.

### FACTS

Salishan is a destination resort located on a hillside overlooking Siletz Bay and the Pacific Ocean near Gleneden Beach. The lodge portion has 205 rooms in units dispersed over a 163-acre site. The units are connected with the main lodge and each other by covered walkways and driveways. The main lodge contains a lobby, dining area, library, gift shop, restaurant, lounge, and art gallery. Adjacent to the lodge is a swimming pool, fitness center, conference rooms, and a large conference auditorium. Three indoor tennis courts and a tennis pro shop are located at the north end of the property. Also part of the resort is an 18-hole golf course and a small shopping center known as the Marketplace. The golf course, Marketplace, and personal property are all assessed in separate tax accounts and are not part of the lodge, the property under appeal.

Constructed in 1965, Salishan has long enjoyed a high reputation if not a high income. It is viewed as a luxury-level resort. The facilities are of quality construction and the furnishings and services are of high caliber. Its four-star restaurant has an extensive wine cellar. In 1996, Defendant YCP Salishan LP (taxpayer) purchased the entire resort from the developer and original owner, John Gray. Taxpayer is a large international real estate company. Shortly after purchase, taxpayer invested approximately $8,000,000 in renovations to the lodge and rooms. Upon purchase of the property, taxpayer installed a new management company. However, income substantially declined after taxpayer purchased the property and in January 1998, taxpayer replaced

---

[1] The county filed a separate appeal for each tax year. The cases were consolidated for purposes of trial and decision.

the management with a new manager operating under The Westin Hotels' flag.

## ISSUE

The issue is the RMV of the lodge as of the assessment date in each case.

## ANALYSIS

RMV is defined by ORS 308.205(1)[2] as follows:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's length transaction occurring as of the assessment date for the tax year."

Traditionally appraisers use three approaches to determine market value: (1) the cost approach, (2) the sales-comparison approach, and (3) the income approach.

The appraisers in these cases agree upon a number of points. They agree that: (1) the highest and best use of the property is its current use, (2) the income approach is to be given the greatest weight, (3) historical or actual income is only a starting point for estimating future income, (4) the actual income received for 1998 and 1999 was not stabilized, and (5) due to the relationship of the lodge, golf course, Marketplace, and personal property, it is not feasible to separately calculate the value of those items by allocating income and expenses. The appraisers agree that the best approach is to determine the value of the whole resort and then deduct the agreed upon RMV of the property in the other tax accounts.

Neil Hundtoft, an appraiser and employee of the Department of Revenue, testified for the county. Hundtoft used the direct capitalization method of the income approach to obtain an indication of the market value of the subject property. That method divides one year's net operating

---

[2] All references to the Oregon Revised Statutes are to 1997.

income (NOI) by an overall capitalization rate. Hundtoft calculated a capitalization rate by dividing the subject's actual 1995 NOI by the subject's 1996 sales price.

Taxpayer purchased the property in August 1996 for $27,980,000 The seller and taxpayer allocated the price as follows:

| | |
|---|---|
| Personal Property | $ 3,011,541 |
| Inventories | 902,763 |
| Intangible Assets | 5,629,829 |
| Real Estate | 18,435,867 |
| Total Purchase Price | $27,980,000 |

In determining the sale price of the real property, Hundtoft made two adjustments. First, after examining the facts and reviewing the law, he found no basis for excluding "intangibles." Therefore, he included $5,629,829 as part of the cost of the real estate, resulting in an indicated value of the real estate of $24,065,696.[3] Hundtoft then divided the actual 1995 NOI ($2,329,531) less reserves of 4 percent ($503,236) by the sale price. Thus, $1,826,295 divided by $24,065,687 gives an indicated overall capitalization rate of .0759.

Hundtoft calculated an alternative capitalization rate by adding $8,000,000 to the total sale price. That was the amount of post-sale renovations made between March and August 1997 and which would have been anticipated at the time of the sale. He calculated the alternative capitalization rate by dividing the buyer's *anticipated* 1998 NOI after reserves ($3,781,000) by the increased sale price of $32,065,687, resulting in an indicated overall capitalization rate of .1179. Based on his view of the industry, Hundtoft concluded that an 8 percent overall rate was appropriate.

Hundtoft then estimated a 1998 gross income of $14,151,810 based on 1995 actual results trended 4 percent.[4] After deducting estimated expenses of $11,206,327 and 3 percent of gross revenues ($424,554) for reserves, he divided the net $2,520,929 by 8 percent to obtain an indicated value for

---

[3] The appraiser found no evidence of intangibles.

[4] Taxpayer corrected some of the numbers in his original appraisal report.

the whole resort of $31,511,612. He then deducted $7,999,321 for the property in the other accounts to arrive at an indicated value of the lodge property of $23,512,291.

Hundtoft also considered two revenue multipliers based on industry surveys. Using his direct capitalization approach, the revenue multipliers, and his analysis of the sale of the subject property, he concluded that the RMV of the lodge property as of January 1, 1998, was $25,500,000. He trended that result 4 percent to arrive at a January 1, 1999, RMV of $26,520,000.

Taxpayer's appraiser, Kent Osborne, used the discounted cash-flow method of the income approach to obtain an indication of value. Using that method, he projected year-by-year earnings for five years, then discounted those earnings at 13 percent to obtain a present value. The method also required him to determine a terminal value by dividing the last year's projected NOI (less reserves) by a direct capitalization rate (he used 10 percent). He then applied a discount rate of 13 percent to convert the estimated terminal value (less selling expenses) to a present value. The total of all those present values was $15,383,177. After subtracting the property in the other accounts ($7,999,321), he derived an indicated value of $7,400,00 for the subject property as of January 1, 1998.

Osborne used the same approach to determine an indicated value for the property as of January 1, 1999. However, because actual income had declined in 1998 and 1999, Osborne's estimated income also declined. As a result, his calculated value for the subject property was only $5,200,000. That significantly lower value is attributable to: (1) a lower estimated income, and (2) a $1,000,000 increase in personal property.[5]

Osborne was aware of the sale of the subject property in August 1996, but concluded that a buyer would give it little or no weight. He based that conclusion primarily upon the decline in actual income. He indicated that taxpayer was

---

[5] An increase in personal property reduces the indicated value because personal property is assessed in a separate account and therefore is deducted from the total resort value to arrive at a value for the lodge only.

optimistic when it purchased the property in 1996, but its optimism was not well founded. Accordingly, Osborne did not believe that the market would be optimistic.

The evidence presents the court with two kinds of evidence of value: (1) the sale of the subject property to taxpayer in August 1996, and (2) the appraisers' analyses and estimates based on the income approach. The court will consider each of those separately. Hundtoft relied upon the sale of the subject property because it was the only "direct evidence from the market" of value. It influenced his estimates of future income, resulting in a low overall capitalization rate, a high NOI, and a high RMV. In contrast, Osborne gave the sale virtually no weight. He indicated that a buyer would not pay the same in January 1998 and 1999 as the buyer did in 1996 unless the NOI forecast was the same.

*Sale of the Subject*

■      The court believes that the sale of the subject property deserves considerable weight. As the Supreme Court in *Kem v. Dept. of Rev.*, 267 Or 111, 114, 514 P2d 1335 (1973) states:

> "* * * If the sale is a recent, voluntary, arm's length transaction between a buyer and seller, both of whom are knowledgeable and willing, then the sales price, while certainly not conclusive, is very persuasive of the market value. * * *" (Citations omitted.)

The evidence indicates that the sale was an arm's-length market transaction between knowledgeable parties and for cash. Considering the nature and size of the property, a sale 17 months before the assessment date is relatively recent. Taxpayer claims that the age of the improvements, their condition, and the location of the property (distance to Portland airport) all detract from its value. However, the court must assume that a knowledgeable and experienced buyer such as taxpayer was fully aware of such obvious facts at the time of purchase. While taxpayer may have had high expectations with regard to increasing profits, certainly it was aware of the actual income history and limitations of the property. Taxpayer would have the court assume that taxpayer made a major mistake that the rest of the market

would avoid. The evidence does not support that assumption. Further, the evidence seems to indicate that marketing and management practices after taxpayer's purchase significantly affected profits.

■ Taxpayer's position focuses too heavily upon the buyer. RMV is not a one-party concept. Buyers are only one half of the equation. In determining the probable value at which the property would change hands in the market place, the appraiser must consider the transaction from the seller's viewpoint as well as the buyer's.

The subject is a high-quality destination resort. It has an excellent reputation and is located in a unique setting. The fact that it is an established facility merits consideration. Hundtoft testified that available locations for destination resorts are becoming rare.

Obsorne appears to have given zero value or consideration to the $5,629,829 of the purchase price allocated by the parties to intangibles. He offered no explanation for ignoring that significant amount. Taxpayer offered no rebuttal testimony to the county's analysis and conclusion that it should be included as part of the purchase price of the real property. Presumably, as the buyer in the transaction, taxpayer had information that it could bring forth if the amount should be excluded for property tax purposes. Consequently, Osborne erred in considering that the price for the real estate was $18,435,867 when it was at least $24,065,696.

Osborne also gave zero value to approximately $8,000,000 in renovations. When questioned, he dismissed the renovations as only "maintaining" the property and adding no value. Intuitively, whether the renovations were replacing "soft goods," such as worn carpeting and drapes, or making "solid improvements," such as installing gas fireplaces in all of the units, it must have added some value. Generally, the market does not invest $8,000,000 unless it expects value in return.

As Hundtoft testified, taxpayer must have anticipated from the beginning that renovations were part of the price of obtaining the facility. Hundtoft acknowledged that

some of the renovation money was spent on personal property, so he added only $7,000,000 to the purchase price of the real estate. That would increase the total price of the real estate to $31,065,696. Deducting $2,516,610 for the golf course and $3,237,851 for the Marketplace left an indicated purchase price for the real property of $25,311,235. Again, taxpayer presented no rebuttal evidence with regard to the nature and extent of the renovations or the cost allocations between real and personal property. The court accepts the county's allocations and determination of the sale price for the subject real property.

*The Income Approach*

In the income approach there are three basic points of disagreement between the appraisers: (1) the rates at which income is to be capitalized or discounted, (2) the estimated NOI, and (3) the amount of reserves for replacements.

Hundtoft selected 8 percent and Osborne used 10 percent as an overall direct capitalization rate. The preponderance of the evidence supports 10 percent. Hundtoft picked 8 percent because the subject had a lower income history and it was consistent with the rate extracted from the sale of the subject. While Hundtoft's position is supported by a strong market demand, the court finds that it fails to recognize the higher risk associated with full-service facilities and this particular property. Further, the market surveys indicate that it is more likely that both a buyer and a seller would use a 10 percent overall rate.

The projection of gross resort income used by taxpayer in purchasing the property was $16,071,000 for 1998. By comparison, Hundtoft projected gross revenue of $14,151,810 and Osborne projected $12,655,573. Hundtoft used 3 percent of gross revenue as a reserve for replacements whereas Osborne used 4 percent. Considering the age and condition of the subject property, the court finds that 4 percent is a more reasonable estimate of the necessary reserve for replacements. For comparison purposes, the court has calculated the comparable 1998 NOIs and an indicated real market value using 4 percent as a reserve for replacements and the direct capitalization method:

| Net Operating Income after Reserves for Replacements | | Capitalized at 10 Percent |
|---|---|---|
| Buyer's Projections | $3,620,160 | $36,201,600 |
| Hundtoft's Projections | $2,379,411 | $23,794,110 |
| Osborne's Projections | $1,468,715 | $14,687,150 |

■    In the reconciliation process, an appraiser tries to reach a logical conclusion that is consistent with the indicated values in the market. One of the first tests that must be applied is the test of reasonableness. Osborne's opinion of $15,383,177 for the total resort as of January 1, 1998, less $7,999,321 for property in the other accounts, leaves $7,383,856 for the subject property under appeal. That implies a loss of $12,596,823 or 45 percent of the purchase price, in just 17 months. Such a conclusion would indicate that the bottom had dropped out of the market. However, the industry survey relied upon by both appraisers indicated that, while there had been some shifting in financing, industry performance overall was strong.

> "The strong performance of the full service hotel sector has been aided by a lack of new supply additions, due to the comparatively higher costs and increasingly difficult barriers to entry in many market areas. * * *"

Further, the survey indicated that the average rates (overall capitalization 10.87 percent, discount 13.5 percent, revenue growth 4.2 percent, and expenses 3 percent) are evidence of a strong market. In fact, the article indicates that the capitalization rates and yield rates are the lowest since 1990. "* * * In other words, hotel investments were more desirable in 1998 than they had been for the preceding eight years. * * *"

Taxpayer contends that a significant increase in the number of motel and hotel rooms in Lincoln County resulted in a loss of demand for the subject. At trial, taxpayer presented an exhibit listing nine Lincoln County motels and hotels, including the subject. The exhibit indicates that occupancy declined 14.3 percent during the three years 1997 to 1999. However, during that same period the subject had a 19

percent decline in occupancy. The fact that the subject's occupancy rate declined more than the potential local competition supports Hundtoft's view that taxpayer's management decisions drastically effected the performance of this property.

■ It is axiomatic that there is danger in placing too much reliance on any one approach to value. While the appraisers agree that the income approach is preferred by investors, relying on that approach alone can be misleading. For example, there was testimony that the subject property was not even profitable for the first 20 years of its existence. If the income approach alone had been relied upon during that period, it could indicate that the property had a zero or even a negative value.

Taxpayer is a knowledgeable international real estate firm that invested $35,000,000 in a property that from 1993 through 1995 averaged an NOI before reserves of only $2,068,950.[6] Subtracting an average replacement for reserves of 4 percent ($483,432) results in a NOI after reserves of $1,585,518. Dividing that amount by the purchase price results in an overall capitalization rate of 4.5 percent. Obviously, taxpayer considered more than just actual income.

Taxpayer points out that it purchased the property on expectations of far greater income. The court acknowledges that optimism on the part of a buyer is part of the market forces. On the other hand, the court is aware that the market would not ignore a decreasing income. However, it would be an error to place too much weight upon it. That is particularly so where there has been a change in management, and the income drops below what one would have anticipated if no sale had taken place. In those circumstances, the income must be considered in light of other evidence of value such as industry trends and comparable sales.

Taxpayer's ardor may have cooled for the subject property, but there is no particular reason to believe that the market has grown weak. Both appraisers projected growth. Their industry survey indicates that the market had grown

---

[6] The court uses the data found on page 6 of Defendant's Exhibit A, noting some inconsistencies with that on page 23.

stronger since 1996, not weaker. Therefore, the court believes it can assume that a buyer of the subject property as of July 1, 1998, would also be optimistic.

Undoubtedly, a buyer would adjust down for the differences in gross revenue and NOI between 1995 and 1997. The gross revenue in 1997 was down 4 percent from 1995, and the NOI was down 16 percent. A simple adjustment would be to decrease the subject's purchase price of $25,311,235 by 16 percent, resulting in an indicated value of $21,261,437 as of January 1, 1998. Using the same approach for 1999, when the gross revenue for 1998 was down 7 percent and the NOI was down 33 percent over 1995, would reduce the purchase price of $25,311,235 by 33 percent. That would indicate a RMV for the subject property of $16,958,527 as of January 1, 1999.

Another way to reflect the decline is to multiply the decreased gross revenue by an industry gross-revenue multiplier as described in the industry survey material. Using the average multiplier of 2.1 from the industry survey tends to replicate the level of optimism held by a buyer at that time. As applied to the 1997 actual gross revenue of $12,037,532, it gives a total value of $25,278,817. Deducting approximately $8,000,000 for the property in the other accounts leaves an indicated value for the subject of $17,278,817. Likewise, for the January 1, 1999, value, applying the multiplier to actual 1998 gross revenue of $11,739,242 gives a total value of $24,652,408, less $8,000,000 in the other accounts, or $16,652,408 for the subject property.

Another method of reconciling disparate indicators of value is to weight them numerically. In this case, one could reason that an actual sale of the subject property, a historical fact, should be given equal weight with an income approach, an opinion of the future. As Hundtoft indicates, a sale is direct evidence of the market. It is not mere speculation or opinion, but an actual transaction. In contrast, the income approach represents an appraiser's judgment based upon historical facts and the appraiser's view of the future. It represents the appraiser's expert attempt to replicate the current thinking of the market. Both indicators have inherent weaknesses. Under the circumstances present in this case,

the court believes that it is reasonable to give them equal weight. Even so, the court is left with two alternatives because of the two income approaches. For the January 1, 1998, assessment date, the court calculates two possible values as follows:

1.) Value based on actual
    sale of property:      $25,311,235 x .50 = $12,655,618

    Value indicated by
    Osborne's DCF:      $ 7,400,000 x .50 = $ 3,700,000

    Total value of subject real property:    $16,355,618

2.) Value based on actual
    sale of property:      $25,311,235 x .50 = $12,655,618

    Value indicated by Hundtoft's DCAP
    [using 4% for reserves: $ 2,379,411 ÷ 10% = $23,794,110
    less $7,999,321]

                $15,794,789 x .50 = $ 7,897,395

    Total value of subject real property:    $20,553,013

It is apparent that there is no one method or perspective that achieves a perfect fit. Accordingly, the court must exercise its judgment in making specific findings of value. Therefore, after considering all of the above, the court finds that the RMV of the subject property as of January 1, 1998, was $18,000,000 and as of January 1, 1999, was $16,000,000. Costs to neither party.