DECISION
Plaintiff, Hartman Development Inc (Hartman Development), appeals the Board of Property Tax Appeals (BOPTA) Order, mailed or delivered March 11, 2008, alleging that the real market value of the bare land, Account R129059, is no more than $150,000. Plaintiff, Roger Hartman (Hartman), appeals a BOPTA Order, mailed or delivered March 11, 2008, alleging that the real market value of developed land and a residential structure, Account R129056, is no more than $509,707.
A trial was held on Thursday, October 9, 2008, in the Oregon Tax Courtroom, Salem, Oregon. Hartman appeared and testified on behalf of Plaintiffs. Linda Austin (Austin), relator and Pegasus Equestrian Estates listing broker, and Richard Banducci (Banducci), builder and contractor, testified on behalf of Plaintiffs. Paul Meyer, Douglas County Counsel, appeared on behalf of Defendant. The following individuals testified on behalf of Defendant: Robert Berger (Berger), Pegasus property developer; Georgia Stiles (Stiles), realtor; Ron Northcraft (Northcraft), Douglas County Assessor; and Susan Acree (Acree), Douglas County Appraiser.
 I. PRELIMINARY MATTERS
The trial of the above-entitled matter was held at the same time as the trial of Gary Leif v. Douglas County Assessor (Leif), TC-MD No 080477D. The tax account appealed in the Leif *Page 2 
matter presents the same issue as the Hartman Development matter: the real market value of an undeveloped parcel of land located in the Douglas County residential development called Pegasus Equestrian Estates (Pegasus).
Leif's authorized representative filed a Motion in Limine on October 8, 2008, [1] requesting that the court exclude from evidence Defendant's exhibits because Defendant failed to comply with Tax Court Rule-Magistrate Division 10. Subsequently, it was discovered that an exhibit submitted by Hartman and referenced by Leif's representative failed to include a revised summary sheet in the exhibit exchanged with Defendant. Defendant verbally requested that the court exclude Plaintiffs' exhibit entitled "COMPARABLE LAND SALES" (Ptfs' Ex 1-5a). The court denied both motions. After discussion, the court stated that the first 31 pages of Defendant's exhibit would be referenced as "Def's narrative at ___" and pages 1 through 69 would be referenced as "Def's Ex ___." Hartman was permitted to give Defendant the correct summary sheet identified as "Ptfs' Ex 1-5a."
Plaintiffs' exhibit and Defendant's exhibit were received with noted objections.
Defendant verbally challenged Plaintiffs' right, through its authorized representative, to file any motion in the court. Defendant stated that ORS 305.230, which describes those qualified to represent taxpayers in the Magistrate Division of the Oregon Tax Court, references ORS 9.320 (necessity for employment of attorney), but not ORS 9.160
which specifically states that "a person may not practice law or represent that person as qualified to practice law until that person is an active member of the Oregon State Bar." ORS 9.160(1). Defendant commented that Plaintiffs' representative is not an attorney and contrasted the language of ORS 305.230 with *Page 3 
ORS 305.245 (representation before tax court magistrate by officer or employee of county) which specifically references ORS 9.160 and ORS9.320.
ORS 9.320[2] states that "[a]ny action, suit, or proceeding may be prosecuted or defended by a party in person, or by attorney, * * * unless otherwise specifically provided by law." ORS 305.230(1) provides that "[n]otwithstanding ORS 9.320" the listed individuals may represent a taxpayer in the Magistrate Division of the Oregon Tax Court. ORS305.230 allows certain individuals to represent taxpayers.
Defendant challenges the right of an authorized representative who is not licensed to practice law to file motions, which it concludes is the practice of law as stated in ORS 9.160. Defendant overlooked ORS9.160(2), which states that "Subsection (1) of this section does not affect the right to prosecute or defend a cause [of action] in person as provided in ORS 9.320." Because ORS 9.160 specifically states that it does not affect the rights of a person to prosecute and defend, and ORS305.230 allows a person to be represented by an authorized representative, this court has consistently granted an authorized representative, as defined in ORS 305.230 the same statutory rights as the person he or she represents. Defendant's motion is denied.
Defendant alleged that Hartman cannot appeal Account R129059 because he is no longer aggrieved, having sold the lot in August 2008. Defendant's reference to aggrieved relates to ORS 305.275 which states in pertinent part:
 "(1) Any person may appeal under this subsection to the magistrate division of the Oregon Tax Court as provided in ORS 305.280 and 305.560, if all of the following criteria are met:
 (a) The person must be aggrieved by and affected by an act, omission, order or determination * * *
 * * * * * *Page 4 
 (b) The act, omission, order or determination must affect the property of the person making the appeal or property for which the person making the appeal holds an interest that obligates the person to pay taxes imposed on the property. * * *
 (c) There is no other statutory right of appeal for the grievance.
 * * * * *
 (3) * * * The appeal under this section is from an order of the board as a result of the appeal filed under ORS 309.100 or from an order of the board that certain corrections, additions to or changes in the roll be made."
(Emphasis added.)
ORS 305.275(3) clearly states that a taxpayer has a right of appeal "from an order of the board." There is no dispute that BOPTA issued an order to Hartman and he filed a timely appeal. Hartman alleges that he is aggrieved because his subject property was overvalued at the time of the assessment and he had an interest in that property that obligated him to pay the property taxes. The court agrees that Hartman filed a timely appeal from a BOPTA Order; he disputed the county assessor's determination of value on property he owned and on which he was obligated to pay property taxes. Defendant's motion to deny Hartman's right of appeal is denied.
 II. STATEMENT OF FACTS
Hartman Development appeals the 2007-08 real market value of its subject property identified as Account R129059, Lot 5 Pegasus. Hartman Development purchased the subject property in January 2006 for $250,000. The subject property is approximately two acres of undeveloped land located in a gated community offering the following amenities: 150' x 70' indoor arena; 10 stall main barn; veterinary barn/storage; 220' x 100' outdoor arena; and hay barn. (Ptfs' Ex 1-4.) Hartman testified that property owners are assessed $150 per month per lot to maintain the amenities and each owner has a 1/10th ownership in the common ground. Hartman Development sold the lot in August 2008, for $186,000, which was less than the original purchase *Page 5 
price ($250,000). (Ptfs' Ex 1-5b.) Hartman wrote that "[t]his lot, after improvements of driveway, major excavation (2,000 yards of dirt removed), and utilities" sold * * *. (Id.)
Hartman appeals the 2007-08 real market value of his subject property identified as Account R129056, Lot 8 Pegasus. The parties agree that onsite developments in the amount of $40,000 should be added to the real market value of Account R129056 because, as of the date of assessment, the property was improved.
Hartman built the improvements; he is "a licensed contractor and developer." (Ptfs' Ex 1-23.) He testified that, as of the assessment date, "the actual costs" plus a "normal contractors fee — 10%" totaled $319,707 for the "3,220 sq ft 4bedroom, 3½ bath, 2 story home which also has a detached, unfinished 1496 sq ft garage." (Ptfs' Ex 1-23, 1-25.) Banducci, a licensed contractor for 13 years and developer for 5 years, testified that he inspected the subject property. He testified that he built a comparable property with a 1,600 square foot covered deck, that Hartman's house does not have, within the last year for $105 per square foot. Banducci testified that the real market value as of the assessment date for Hartman's property should be less than $105 per square foot.
Hartman testified that cost is the correct way to determine real market value because the home was not complete as of the assessment date. He cited ORS 308.205 (2)(a), stating that real market value is the "value that justly compensates the owner," and he referenced the Tax Court case "Watkins," stating that it "required the property to be valued at cost." Hartman testified that he did not have an occupancy permit until August 2008, and the following items were not complete as of the assessment date: no carpet in bonus room; tile work not sealed; incomplete trim work; no sound system; exterior columns not painted; no railing on deck; gravel (rather than paved) driveway; and no landscaping. Acree testified that Hartman told her the cost to "complete the house" was approximately $3,000. At the BOPTA hearing, Hartman estimated that the house *Page 6 
was "90 percent complete," which given the costs to date suggest that "$30,000 or $40,000" additional costs would be incurred to complete the improvements.
Hartman testified that he has received no offers for his house and lot that were listed for sale in July 2007 for $699,000. He testified that the property still has a gravel driveway and no landscaping.
Hartman selected four sales as comparable to his property. The square footage ranged from 2,930 to 3,139 and the adjusted sale prices ranged from $525,000 ($167 per square foot) to $612,500 ($197 per square foot). (Ptfs' Ex 1-31.) Using an adjusted average price per square foot of $186, Hartman computed a real market value of $598,900, which he reduced by 10 percent because he concluded that his home was 90 percent complete as of the assessment date. (Id.) Hartman's total adjusted real market value of land and improvements was $539,028. (Id.)
Hartman's "comparable #3" (which he built) is "identical" to his home, except comparable #3 does not have a three car detached garage. He testified that he made no adjustment for the detached garage because comparable #3 "has an older app. 28 x 40 3 stall horse barn" with a "new roof." (Ptfs' Ex 1-28.) Hartman concluded that the barn and detached garage are "functionally and structurally" similar. Also, he concluded that "a detached garage does not add much value," and it "rarely brings any more than the cost of the house." He testified that his detached garage cost $32,000 to build. Hartman testified that comparable #3 has many amenities, including "a tile roof, 10' circular driveway and paving." Comparable #3 is not located in a gated community, but has a gate which Hartman states "limits access." Hartman testified that, for this property, there are no common area fees or homeowner association fees. *Page 7 
Hartman's comparable #1, which is 3,139 square feet, is located in a gated community on five acres. (Ptfs' Ex 1-26.) It does not have a detached garage. Hartman adjusted the sale prices of both comparables #1 and #3 by $15,000 per acre for land in excess of two acres and paving and landscaping. (Ptfs' Ex 1-31.) Hartman did not explain how he determined the paving and landscaping adjustment for each comparable sale. He made no adjustment to the sale prices for gated communities or homeowners' interest in common areas.
Using the cost approach, Acree computed "an Indicated Value of Imp[rovement]s" of $548,200. (Def's narrative at 24.) She testified that the "local cost modifier (LCM) is a market derived modifier that is utilized to modify the Cost Factors contained in the Residential Buildings Manual" [provided by the Oregon Department of Revenue]. The modified values are adjusted to reflect costs in the local area. * * * The LCMs are then applied to the base data." (Id.) Acree's indicated value included the $3,000 "cost to complete." (Id.) She computed a cost of $59,840 for the detached garage. (Id.)
Acree selected eight sales as comparable to Hartman's improved property, which ranged in unadjusted sale prices from $620,000 to $975,000 and $216 to $244 per square foot. (Def's narrative at 25-29.) She wrote that the "comparable homes selected have similar features and amenities to the subject home." (Id. at 28.) Acree concluded that comparable #1, which she described as "a pre-sold version of the subject * * * [and the] exact same house" as Hartman's house was the "best indicator of value." (Def's narrative at 25, 28.) She went on to state that "[g]iven on Comp #1 was built and sold by Hartman Development Inc for $695,000 without a realtor and lacked the subjects (sic) detached garage and also lacked river irrigation relatively minor adjustment is required in order to have strong support for the subject property as improved." (Id. at 30.) Acree wrote that comparable #1 "does not have a detached garage, not in a gated community and lacks river water irrigation rights; it is landscaped. It is located just *Page 8 
minutes from the subject." (Id. at 28.) Comparable #1 sold May 19, 2006, for $695,000. (Id. at 26.) Acree increased the sale price for a detached garage ($52,360). She wrote that "Comps #2 #3 are custom spec homes that have detached garages but of lesser square footage. * * * The detached garages on comps 2 and 3 range in value is $31 to $45 per square foot." (Id. at 28.) She wrote that "[f]rom these 2 sales the market's contributory value was extracted for the subject's detached garage. In a final correlation comp #1 that lacks detached garage will be adjusted at $35/SF for the subject's 1496 SF garage." (Id.) Acree reduced the sale price for "Site Development and irrigation, etc." adjustments and "Cost to Complete" to arrive at an "indicator" of the subject property's value (land and improvements) in the amount of $730,000. (Id. at 29.) She made no adjustment for the date of sale, which was seven months prior to the assessment date.
 III. ANALYSIS
The issue before the court is the real market value of Plaintiffs' property — bare land and land and improvements. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." Richardson v. Clackamas County Assessor, TC-MD No 020869D, WL 21263620, at *2 (Mar 26, 2003) (citing Gangle v. Dept. of Rev.,13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1) (2005), which reads:
 "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."
A. Approaches of Valuation — Real Market Value
There are three approaches of valuation (cost, income, and comparable sales) that must be considered in determining the real market value of a property, even if one of the approaches is found to not be applicable.See ORS 308.205(2) (2005) and OAR 150-308.205-(A)(2) (2005). *Page 9 
B. Hartman Development Land
The income approach is not an applicable method to value property like the subject, which is bare nonincome residential land.
The cost approach is considered useful in estimating the real market value of new construction because cost and market value can be more closely related when properties are new. The cost approach separates land and improvement values. The parties agree that Hartman Development's purchase price of the subject property (land) is not the correct real market value as of January 1, 2007.
In a case such as the one before the court, the comparable sales approach "may be used to value improved properties, vacant land, or land being considered as though vacant." Chambers Management Corp v. LaneCounty Assessor, TC-MD No 060354D (Apr 3, 2007) (citing Appraisal Institute, The Appraisal of Real Estate 335 (12th ed 2001)). The court looks for "arm's length sale transactions of property similar in size, quality, age and location" to a taxpayer's property in order to determine the real market value. Richardson, WL 21263620, at *3.
Hartman Development purchased the subject property in January 2006, paying $250,000. Hartman Development was one of three parties who purchased one of the 10 available two-acre land parcels. There were no other sales for the next 14 months, until the listing price was reduced to $150,000. At that time, all remaining seven lots sold within 30 days.
Plaintiffs conclude that the seven sales which took place slightly more than two months after the assessment date, January 1, 2007, support their determination that the subject property's real market value should be $150,000. The Oregon Supreme Court concluded that "[i]f the sale [of the subject property] is a recent, voluntary, arm's length transaction between a buyer and seller, both of whom are knowledgeable and willing, then the sales price, while certainly not conclusive, is very persuasive of the market value." Kem v. Dept. of Rev., 267 Or 111, 114,514 P2d 1335 (1973). The Court "emphasize[s] * * * that a recent sale of the subject property is not necessarily determinative of *Page 10 
market value and does not foreclose other methods of valuation."Id. at 115. Because the subject property is bare land located in the same subdivision where there are other similar size lots sharing the exact same amenities, the parties acknowledge that those sales are similar to selling the unimproved subject property. The evidence supports the conclusion that the buyers of the seven lots in March 2007 and April 2007 tracked the listing price of the Pegasus parcels and, within days of receiving notice of the $40,000 per lot reduction, the buyers purchased all available lots. The reduced listing price enticed one buyer to purchase three parcels.
This court stated that "[i]n determining the probable value at which the property would change hands in the market place, the appraiser must consider the transaction from the seller's viewpoint as well as the buyer's." Lincoln County Assessor v. YCP Salishan LP, 15 OTR 354, 360
(2001). The seller, Berger, testified that it was time to "get out of the project," and he could have taken "$1 for the lots." The price of the lots was reduced to achieve his goal of transferring his real property ownership to others. Considering the transaction from the seller's viewpoint, the sale prices were set at a value which resulted in a quick sale and transfer of ownership. Even though those seven properties are the best comparables, the sale prices are not indicative of the subject property's market value because the prices were set to "get out of the project." The listing price reduction and subsequent land sales support Plaintiff's allegation that $195,000 was not the price point at which a buyer would purchase the land and, therefore, $195,000 was not the market value as of the assessment date.
Both parties presented a number of comparable sales. Plaintiff presented eight land sales and Defendant reviewed over 30 unimproved parcels. Pegasus Lot 5 was one of the three parcels originally purchased in January 2005 for $250,000. In August 2008 after it was improved (driveway and utilities), it sold for $186,000. That sale is more than 20 months after the assessment date and therefore is not a reliable indicator of market value as of the assessment date. *Page 11 
Both parties made adjustments to sale prices of properties they deemed comparable, but provided no supplemental data to support the quantitative amount of their adjustments. For example, Plaintiffs adjusted the sale price for location, size, and improved lot. (Ptfs' Ex 1-21.) Plaintiffs did not provide any supplemental information to show how the amount of each adjustment was computed. The lack of information suggests subjectivity without basis and provides no factual information to assist the court in its determination of value.
Plaintiffs' "average adjusted sale price" was $160,375. (Ptfs' Ex 1-21.) Four of Plaintiffs' adjusted sales closest to the assessment date ranged from $180,000 to $190,000 with one adjusted sale at $150,000. (Id.) Defendant stated that the "most similar" property to Plaintiffs' was comparable sale #9 which was "located in the Garden Valley area, a gated community; with irrigation rights and common areas." (Def's narrative at 23.) Defendant's adjusted sale price for the .99 acre parcel was $184,500. (Id.) The parties' comparable sales which occurred closest to the assessment date cluster around $185,000. Based on the evidence and testimony, the court concludes that the subject property's real market value as of January 1, 2007, was $185,000.
C. Hartman Land
Hartman appeals the 2007-08 real market of his subject property identified as Account R129056, Lot 8 Pegasus. The parties agree that onsite developments in the amount of $40,000 should be added to the real market value of Account R129056 because, as of the date of assessment, the property was improved. This court concluded that the real market value of bare land of property located in the same subdivision as of the assessment date was $185,000. Given the agreed onsite development costs of $40,000, the 2007-08 real market value of Hartman's developed land was $225,000 as of the assessment date. *Page 12 
D. Hartman Improvements: Cost Approach
The cost approach is considered useful in estimating the real market value of new construction because cost and market value can be more closely related when properties are new. Hartman testified that his structure was partially complete. He suggests that the court follow its holding in Watkins, and value the property based on the total "cost of the work completed as of" the assessment date. Watkins v. Dept. ofRev., 14 OTR 227, 230 (1997). This court concluded that because real market value "assumes an active or `immediate' market by which value can be inferred from a number of transactions, * * * [r]arely is there a market for partially completed structures." Id. at 229. InWatkins, the structure was 28 percent complete. Id. at 230. Given the very incomplete stage of the structure, the court concluded that there would be few, if any, buyers. In contrast, the estimated cost to complete the small handful of unfinished cosmetic-like items identified in the Hartman structure was $3,000. When compared to the projected actual cost of the structure, the cost to complete was less than one percent. The court does not agree with Hartman that the court's holding in Watkins is applicable to the facts of this case.
Hartman's total "actual cost" including detached garage and a 10 percent contractor's fee was $319,707. (Ptfs' Ex 1-25.) Defendant's "indicated value of im[provement]s" using cost factors and local cost modifier was $548,200. (Def's narrative at 24.) The difference between those two estimates is substantial. There is no evidence to reconcile the substantial difference in estimated costs. The cost approach is "less useful where the evidence of cost is incomplete, distorted, or otherwise unreliable." Magno v. Dept. of Rev., 19 OTR 51, 55 (2006). Given the significant difference in the cost estimates and lack of evidence to reconcile the difference, the court finds the reliability of the cost approach questionable. *Page 13 
E. Hartman Improvements: Comparable Sales Approach
In a case such as the one before the court, the comparable sales approach "may be used to value improved properties, vacant land, or land being considered as though vacant." Chambers Management Corp, TC-MD No 060354D (citing Appraisal Institute, The Appraisal of Real Estate 335 (12th ed 2001)). Hartman presented four properties as comparable and concluded that $186 per square foot was an average adjusted selling price. (Ptfs' Ex 1-31.) Hartman applied his estimate of price per square foot to total living space (3,220) to compute an indicated value of $598,900. He adjusted the indicated value for his estimate that the structure was 10 percent incomplete as of the date of assessment. (Id.) Because the court previously concluded that Hartman's estimate of incomplete was substantially overstated, the court concludes that the 10 percent adjustment is not warranted. Hartman made no other adjustments. (Id.)
Defendant presented eight properties as comparable, ranging from $216 to $244 per square foot. Defendant selected the property located at 165 Winter Creek Lane (comparable #1) as most like the subject property because the house "is identical * * * to the "subject and built by Roger Hartman, acting as his own general contractor." (Def's narrative at 26.) That home, which is not located in a gated community and does not have a detached garage, sold in May 2006, seven months prior to the assessment date, for $223 per square foot. Defendant did not adjust any of the sale prices for time, the difference between the sale date and assessment date. Defendant submitted evidence that "average" sale prices "for the 12 months ending in August 2008 [when compared] with those of the 12 months immediately prior * * * decreased 9.5% * * * and the median sale price fell 5.4%." (Def's Ex 61.) Similar information was not provided for the 12-month period, beginning in 2006 and ending in 2007. Defendant provided evidence showing that there was an overall increase in properties available for sale beginning in June 2006 and that by January 2007 the inventory had doubled from May 2006. (Id.) According to the 12-month comparative period ending August 2008, the increase in *Page 14 
available inventory resulted in a downward pressure on sale prices. Because Acree's comparable sales #1, #2, and #3 occurred before the inventory of properties built up and five to seven months prior to the assessment date, the court concludes that, based on the evidence, those comparable sale prices are higher than for properties that sold closer to the assessment date of January 1, 2007.
Acree made three adjustments to the estimated comparable #1 sale price of $695,000. (Def's narrative at 29.) Acree concluded using comparable sales #2 and #3 that the contributory value of the detached garage was approximately $52,000. (Def's narrative at 27, 29.) She added that value to comparable #1's unadjusted sale price. (Id. at 29.) Hartman testified that the detached garage cost approximately $32,000 to build and questioned whether a buyer would even pay cost for a detached garage. Evidence to determine the contributory value of the detached garage is incomplete. In her analysis of the value of the detached garage, Acree determined the same site value for comparables #2 and #3, even though comparable #3 was located in a gated community. She did not adjust either sale price for time; the sale of comparable #3 occurred more than six months after the assessment date. (Def's narrative at 27.)
Acree's other adjustments were for "Site Development and irrigation" and cost to complete. (Def's narrative at 29.) Acree's site development adjustment was $15,000, whereas Hartman's adjustment to comparable sale prices for landscaping ranged from $35,000 to $55,000 and included paving because his driveway is gravel. (Id.; Ptfs' Ex 1-31.) Neither party provided supporting documents for their onsite improvement adjustments. The reasonableness and accuracy of the adjustments is unknown. Acree's third adjustment was $3,000, the cost to complete the structure. (Def's Narrative at 29.) *Page 15 
Even though Hartman estimated the overall real market value of his property to be $598,900 without the 10 percent completion adjustment, Hartman listed the property for sale in July 2007 for approximately $700,000 — a real market value close to Acree's unadjusted comparable #1 May 2006 sale price. Hartman testified that there have been no offers to purchase his property. Even though the market has yet to validate either party's $700,000 estimate of value, the evidence supports a market value for the subject property close to $700,000 as of January 1, 2007.
The court concludes that the evidence supports a price per square foot of $215 for the subject property as of the assessment date. Given contradictory or incomplete evidence, the court makes no adjustments for the detached garage, onsite developments such as paving and landscaping, or insignificant estimated completion costs. The court concludes that, as of the assessment date, the subject property's improvement real market value was $467,300.
 IV. CONCLUSION
Based on a careful review of the evidence, the court concludes that the comparable sales approach is the best method to determine the real market values for tax year 2007-08. Now, therefore,
IT IS THE DECISION OF THIS COURT that the real market value of Account R129059 for tax year 2007-08 is $185,000;
IT IS FURTHER DECIDED that the real market value of Account R129056 for tax year 2007-08 is $692,300 (land $225,000 and improvements $467,300);
IT IS FURTHER DECIDED that Plaintiffs' Motion In Limine and Defendant's motion to exclude evidence are denied; *Page 16 
IT IS FURTHER DECIDED that an individual authorized under ORS 305.230
to represent a Plaintiff has the same statutory rights as the person he or she represents; and
IT IS FURTHER DECIDED that Hartman, who filed a timely appeal from a BOPTA Order, was aggrieved.
Dated this ___ day of December 2008.
If you want to appeal this Decision, file a Complaint in the RegularDivision of the Oregon Tax Court, by mailing to: 1163 State Street,Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 StateStreet, Salem, OR.
 Your Complaint must be submitted within 60 days after the date of theDecision or this Decision becomes final and cannot be changed.
 This document was signed by Presiding Magistrate Jill A. Tanner onDecember 30, 2008. The Court filed and entered this document on December30, 2008.
[1] Leif's representative filed the same motion in the above-entitled matter. Because Leif's representative was not an authorized representative in the above-entitled matter, the motion was not properly filed. Hartman did not present the motion on his own behalf.
[2] Unless otherwise stated, references to the Oregon Revised Statutes (ORS) are to year 2007. *Page 1