DECISION
Plaintiff appeals the Board of Property Tax Appeals (BOPTA) Order, dated March 11, 2008, alleging that the real market value of his property is no more than $150,000.
A trial was held on Thursday, October 9, 2008, in the Oregon Tax Courtroom, Salem, Oregon. Steve Gerlt appeared on behalf of Plaintiff. Roger Hartman (Hartman), developer and owner of property located in Pegasus Equestrian Estates (Pegasus), and Linda Austin (Austin), realtor and Pegasus listing broker, testified on behalf of Plaintiff. Paul Meyer, Douglas County Counsel, appeared on behalf of Defendant. The following individuals testified on behalf of Defendant: Robert Berger (Berger), Pegasus property developer; Georgia Stiles (Stiles), realtor; Ron Northcraft (Northcraft), Douglas County Assessor; and Susan Acree (Acree), Douglas County Appraiser.
 I. PRELIMINARY MATTERS
The trial of the above-entitled matter was held at the same time as the trial of Roger A. Hartman (Hartman) and Hartman DevelopmentInc. (Hartman Development) v. Douglas County Assessor, TC-MD No 080482C. The tax account appealed in the Hartman Development matter presents the same issue as the above-entitled matter: the real market value of an undeveloped parcel of land located in the Douglas County Pegasus residential development. *Page 2 
Plaintiff filed a Motion in Limine on October 8, 2008.[1] Plaintiff requested that the court exclude from evidence Defendant's exhibits because Defendant failed to comply with Tax Court-Magistrate Division Rule 10. Subsequently, it was discovered that an exhibit submitted by Hartman and referenced by Plaintiff failed to include a revised summary sheet in the exhibit exchanged with Defendant. Defendant verbally requested that the court exclude Plaintiff's exhibit entitled "COMPARABLE LAND SALES." The court denied both motions. After discussion, the court stated that the first 31 pages of Defendant's exhibit would be referenced as "Def's narrative at ___" and pages 1 through 69 would be referenced as "Def's Ex ___." Hartman was permitted to give Defendant the correct summary sheet identified as "Ptf's Ex 1-5a."
Plaintiff's exhibit including Exhibit 1 from Hartman's and HartmanDevelopment's (TC-MD No 080482C) (referred to as Ptf's Ex 1) and Defendant's exhibit were received with noted objections. Plaintiff's rebuttal exhibits 2-2 through 2-8 were offered, objected to, and not received because the contents of the exhibits were duplicates of other received exhibits.
Defendant verbally challenged Plaintiff's right, through its authorized representative, to file any motion in the court. Defendant stated that ORS 305.230, which describes those qualified to represent taxpayers in the Magistrate Division of the Oregon Tax Court, references ORS 9.320 (necessity for employment of attorney), but not ORS 9.160
which specifically states that "a person may not practice law or represent that person as qualified to practice law until that person is an active member of the Oregon State Bar." ORS 9.160(1). Defendant commented that Plaintiff's representative is not an attorney and contrasts the language of ORS 305.230 with *Page 3 
ORS 305.245 (representation before tax court magistrate by officer or employee of county), which specifically references ORS 9.160 and ORS9.320.
ORS 9.320[2] states that "[a]ny action, suit, or proceeding may be prosecuted or defended by a party in person, or by attorney, * * * unless otherwise specifically provided by law." ORS 305.230(1) provides that "[n]otwithstanding ORS 9.320" the listed individuals may represent a taxpayer in the Magistrate Division of the Oregon Tax Court. ORS305.230 allows certain individuals to represent taxpayers.
Defendant challenges the right of an authorized representative who is not licensed to practice law in this state to file motions, which it concludes is the practice of law as stated in ORS 9.160. Defendant overlooked ORS 9.160(2) which states that "Subsection (1) of this section does not affect the right to prosecute or defend a cause [of action] in person as provided in ORS 9.320." Because ORS 9.160
specifically states that it does not affect the rights of a person to prosecute and defend, and ORS 305.230 allows a person to be represented by an authorized representative, this court has consistently granted an authorized representative, as defined in ORS 305.230, the same rights as the person he or she represents. Defendant's motion is denied.
 II. STATEMENT OF FACTS
Plaintiff appeals the 2007-08 real market value of the subject property identified as Account R129058, Lot 7 Pegasus Equestrian Estates. Plaintiff purchased the subject property in January 2006 for $250,000. The subject property is approximately two acres of undeveloped land located in a gated community offering the following amenities: 150' x 70' indoor arena; 10 stall main barn; veterinary barn/storage; 220' x 100' outdoor arena; and hay barn, and 30 acres of common area. (Ptf's Ex 1-4.) Plaintiff testified that property owners are assessed $150 per *Page 4 
month per lot to maintain the amenities and each owner has a 1/10th ownership in the common ground.
Plaintiff appealed Defendant's 2007-08 real market value of $237,500 to BOPTA. BOPTA reduced the subject property's real market value to $195,000, which is the real market value now requested by Defendant. Plaintiff alleges that the subject property's real market value is no more than $150,000, the sale prices of seven other lots in Pegasus that were recorded in April 2007 and May 2007. (Ptf's Ex 1-5b; Def's narrative at 21.)
Hartman testified that the Pegasus lots were originally advertised in August 2005, for sale at prices in excess of $400,000. Hartman testified that the lot with the highest listing price ($485,000) and best view was one of the last to sell for $150,000. (Ptf's Ex 1-19.) The listing broker, Austin, testified that at the time of the original listing in August 2005 she performed a comparative market analysis which the developer did not use to set the listing prices. Austin testified that the lots were "extensively marketed" in national publications, "RMLS," her "website," and "open houses for other realtors."
The listing prices were lowered to $250,000 when there had been no sales by January 2006. Plaintiff purchased one of three lots sold in January 2006 for $250,000. Austin testified that the listing prices were reduced in September 2006 to $195,000. When there were still no sales or offers and the "days on the market exceeded the average," Austin testified that the listing prices were reduced in March 2007 to $150,000. (Def's Ex 57.) Austin testified that the remaining seven lots sold within days of the listing prices being reduced. One purchaser, Weston, bought three lots, and the other lots were sold to four other individuals. (Def's Ex 5.) *Page 5 
Austin testified that there was not a "feeding frenzy" because "people had been watching the properties" and she notified "all agents of the price reduction" who, in turn, found buyers for the lots. Austin testified that in March 2007 the Roseburg real estate market was "past the top" and those lots were not "fire sales" because the developer was not in a "financial situation where he had to sell." When asked what she believes was the real market value of the subject property as of the January 1, 2007, assessment date, Austin testified that, based on her comparative market analysis study, the value was $150,000. Pegasus Lot 5, the lot appealed by Hartman Development in TC-MD No 080482C, was sold in August 2008, for $186,000. (Ptfs' Ex 1-5b.) Hartman wrote that "[t]his lot, after improvements of driveway, major excavation (2,000 yards of dirt removed), and utilities" was sold for less than its original purchase price ($250,000). (Id.) Stiles, a Roseburg realtor for more than 36 years and past member of the Board of Equalization and BOPTA, testified that she believes the listing price of $150,000 was not "market driven," but chosen so that the lots would "sell fast." Stiles testified that the average "carrying time from listing to date of sale" is five or six months and the seller did not test the market long enough to see if $195,000 was a "market price." Northcraft agreed with Stiles, testifying that residential inventory of properties "doubled" from January 2006 to January 2007 and concluding that the "lots were not on the market a long enough time" to test the $195,000. (Def's Ex 61.) He testified that "his appraisers" reviewed over "30 sales" which "bracketed the assessment date" and concluded that there is "sufficient evidence" to "support" a real market value of $195,000. Acree selected four of the 30 sales as "the best indicators of value for the subject lots." (Def's narrative at 23.) She concluded that a property (.99 acres) located in a gated community with irrigation rights and "6+ acres of common area" in the Garden Valley area, which sold in *Page 6 
March 2007 for $205,000 ("indicated value $184,500"), was most similar to the subject property. (Id.; Def's narrative at 19.) Acree's "indicated average value" was $196,938. (Def's narrative at 23.)
Berger, who characterized himself as the "decision maker" with respect to the Pegasus project, testified that he authorized the change in listing prices. He testified that he received information that the "nation's housing was getting into a major slump." Berger concluded that it was time to "get out of the project," which he described as a "Rolls Royce in a Volkswagen town" and "put it [the project] away." He commented that Pegasus "was a dream for horsemen and a beautiful project," but that "most people could not fulfill the dream." Berger testified he no longer wanted to own real estate. He emphasized that there was no "financial distress;" he could have taken "$1 for the lots" and there would have been "no significant financial difference" to him.
Hartman presented eight land sales. (Ptf's Ex 1-5a.) The lot located at 121 Deer Fern Way is approximately the same size as the subject property and "located in the prestigous (sic) Winchester Ridge gated subdivision, located less than 1 mile from the Roseburg city limits." (Id.) It was originally listed for $200,000 and at the time of sale, December 20, 2006, was listed for $183,750. (Id.) Hartman testified that it sold for $160,000. (Id.) He adjusted (reduced) the sale price $10,000 because of the property's location. (Ptf's Ex 1-21.) Defendant challenged that sale because of the number of lots in the subdivision and the number of lots sold to builders. Defendant presented seven comparable sales in the Winchester Ridge subdivision that sold for prices ranging from $197,500 to $279,750. (Def's narrative at 21.) Acree testified that the Deer Fern Way lot was repurchased "by the builder" approximately 10 months after Hartman's reported sale for approximately $184,000. *Page 7 
Hartman testified that two parcels located in Champagne Creek, a "gated subdivision, which is located 3 1/2 miles west of Roseburg," sold in May 2007 for $150,000 ("originally listed at $170,000"), and November 2007 for $170,000 ("originally listed at $225,000") "with a $10,000 excavation allowance." (Ptf's Ex 1-5a.) Neither of the sale prices of those properties were adjusted. (Ptf's Ex 1-21.) Acree testified that the Champagne Creek subdivision is not a "desirable area" because "you drive by a cemetery, fire station and gravel pit."
Hartman testified that three 1.5 acre and one 1.2 acre lots located in Pine Meadows, "a gated subdivision on Garden Valley Road," sold in October 2006 for $170,000 to $180,000. (Ptf's Ex 1-5a.) The four sale prices were increased $10,000 for "size." (Ptf's Ex 1-21.)
Hartman's last comparable land sale, "a 5 acre spectacular view lot, adjacent to the western city limits of Roseburg, overlooking Garden Valley, sold 5/31/06 for $185,000." (Ptf's Ex 1-5a.) Hartman noted that at the time of sale, "it was listed at $230,000 and originally listed at $249,000." (Id.) He testified that he reduced the sale price $15,000 per acre, or $45,000, and increased the sale price $25,000 because the property was not located in a gated community. (Ptf's Ex 1-21.) Acree testified that this lot is located close to a "busy, noisy intersection" with a view of "commercial" properties and there is a "long, bumpy, dirt driveway" to the lot. She testified that, based on her research, there is no support for Plaintiff's $15,000 per acre adjustment; the market does not reflect a substantial difference in sale price based on the size of the lot.
Hartman computed an average adjusted sale price for his comparable land sales of $160,375. (Id.) He concluded that "[g]iven the sales of lots in Pegasus [those sales] should have more weight in determining value of the lots under appeal, the value as of Jan 07 should be" $150,000. (Id.) Hartman testified that "buyers determine value" and the market as of the assessment date was $150,000 for lots located in the Pegasus subdivision. *Page 8 
 III. ANALYSIS
The issue before the court is the real market value of Plaintiff's property. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." Richardson v.Clackamas County Assessor, TC-MD No 020869D, WL 21263620, at *2 (Mar 26, 2003) (citing Gangle v. Dept. of Rev., 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1) (2005), which reads:
 "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."
A. Approaches of Valuation — Real Market Value
There are three approaches of valuation (cost, income, and comparable sales) that must be considered in determining the real market value of a property, even if one of the approaches is found to not be applicable.See ORS 308.205(2) (2005) and OAR 150-308.205-(A)(2) (2005).
The income approach is not an applicable method to value property like the subject, which is bare non-income producing residential land.
The cost approach is considered useful in estimating the real market value of new construction because cost and market value can be more closely related when properties are new. The cost approach separates land and improvement values. The parties agree that Plaintiff's purchase price ($250,000) of the subject property (land) is not the correct real market value as of January 1, 2007.
B. Comparable Sales Approach
In a case such as the one before the court, the comparable sales approach "may be used to value improved properties, vacant land, or land being considered as though vacant." Chambers Management Corp v. LaneCounty Assessor, TC-MD No 060354D (Apr 3, 2007) (citing The Appraisal Institute, The Appraisal of Real Estate 335 (12th ed 2001)). The court looks for "arm's *Page 9 
length sale transactions of property similar in size, quality, age and location" to a taxpayer's property in order to determine the real market value. Richardson, WL 21263620 at *3.
Plaintiff purchased the subject property in January 2006, paying $250,000. Plaintiff was one of three parties who purchased one of the 10 available two-acre land parcels; the other two lots were purchased by Hartman and Hartman Development. There were no other sales for the next 14 months, until the listing price was reduced to $150,000. At that time, all remaining seven lots sold within 30 days.
Plaintiff concludes that the seven sales which took place slightly more than two months after the assessment date, January 1, 2007, support his determination that the subject property's real market value should be $150,000. The Oregon Supreme Court concluded that "[i]f the sale [of the subject property] is a recent, voluntary, arm's length transaction between a buyer and seller, both of whom are knowledgeable and willing, then the sales price, while certainly not conclusive, is very persuasive of the market value." Kem v. Dept. of Rev., 267 Or 111, 114,514 P2d 1335 (1973). The Court "emphasize[s] * * * that a recent sale of the subject property is not necessarily determinative of market value and does not foreclose other methods of valuation." Id. at 115. Because the subject property is bare land located in the same subdivision where there are other similar size lots sharing the exact same amenities, the parties acknowledge that those sales are similar to selling the unimproved subject property. The evidence supports the conclusion that the buyers of the seven lots in March 2007 and April 2007 tracked the listing price of the Pegasus parcels and within days of receiving notice of the $40,000 per lot reduction, the buyers purchased all available lots. The reduced listing price enticed one buyer to purchase three parcels.
This court stated that "[i]n determining the probable value at which the property would change hands in the market place, the appraiser must consider the transaction from the seller's viewpoint as well as the buyer's." Lincoln County Assessor v. YCP Salishan LP, 15 OTR 354, 360
(2001). The *Page 10 
seller, Berger, testified that it was time to "get out of the project," and he could have taken "$1 for the lots." The price of the lots was reduced to achieve his goal of transferring his real property ownership to others. Considering the transaction from the seller's viewpoint, the sale prices were set at a value which resulted in a quick sale and transfer of ownership. Even though those seven properties are the best comparables, the sale prices are not indicative of the subject property's market value because the prices were set to "get out of the project." The listing price reduction and subsequent land sales support Plaintiff's allegation that $195,000 was not the price point at which a buyer would purchase the land and, therefore, $195,000 was not the market value as of the assessment date.
Both parties presented a number of comparable sales. Plaintiff presented eight land sales and Defendant reviewed over 30 unimproved parcels. Pegasus Lot 5 was one of the three parcels originally purchased in January 2005, for $250,000. In August 2008, after it was improved (driveway and utilities), it sold for $186,000. That sale is more than 20 months after the assessment date and therefore is not a reliable indicator of market value as of the assessment date.
Both parties made adjustments to sale prices of properties they deemed comparable but provided no supplemental data to support the quantitative amount of their adjustments. For example, Plaintiff adjusted the sale price for location, size, and improved lot. (Ptf's Ex 1-21.) Plaintiff did not provide any supplemental information to show how the amount of each adjustment was computed. The lack of information suggests subjectivity without basis and provides no factual information to assist the court in its determination of value.
Plaintiff's "average adjusted sale price" was $160,375. (Ptf's Ex 1-21.) Four of Plaintiff's adjusted sales closest to the assessment date ranged from $180,000 to $190,000 with one adjusted sale at $150,000. (Id.) Defendant stated that the "most similar" property to Plaintiff's was comparable sale #9 which was "located in the Garden Valley area, a gated community; with irrigation rights and common areas." (Def's narrative at 23.) Defendant's adjusted sale price for the .99 acre parcel was *Page 11 
$184,500. (Id.) The parties' comparable sales which occurred closest to the assessment date cluster around $185,000. Based on the evidence and testimony, the court concludes that the subject property's real market value as of January 1, 2007, was $185,000.
 IV. CONCLUSION
After careful review of the evidence presented, the court concludes that the real market value of the subject property is $185,000. Now, therefore,
IT IS THE DECISION OF THIS COURT that the real market value of Plaintiff's property identified as R129058 as of January 1, 2007, is $185,000;
IT IS FURTHER DECIDED that Plaintiff's Motion In Limine and Defendant's motion to exclude evidence are denied; and
IT IS FURTHER DECIDED that an individual authorized under ORS 305.230
to represent a Plaintiff has the same statutory rights as the person he or she represents.
Dated this day of December 2008.
If you want to appeal this Decision, file a Complaint in the RegularDivision of the Oregon Tax Court, by mailing to: 1163 State Street,Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 StateStreet, Salem, OR.
 Your Complaint must be submitted within 60 days after the date of theDecision or this Decision becomes final and cannot be changed.
 This document was signed by Presiding Magistrate Jill A. Tanner onDecember 30, 2008. The Court filed and entered this document on December30, 2008.
[1] Plaintiff's representative filed the same motion in Hartman andHartman Development. Because Plaintiff's representative was not an authorized representative in that matter, the motion was not properly filed. Hartman, who was the authorized representative, did not present the motion on his own behalf.
[2] Unless otherwise stated, references to the Oregon Revised Statutes (ORS) are to year 2007. *Page 1